# 25-263

## United States Court of Appeals
### for the
### Second Circuit

In Re: RML, LLC,

*Debtor.*

*(caption continued on inside cover)*

On Appeal from the Bankruptcy Court for the Southern District of New York
No. 1:22-bk-10784 (Hon. David S. Jones)

### [PROOF] BRIEF FOR APPELLANTS

Kevin C. Maclay
James P. Wehner
Todd E. Phillips
Lucas H. Self
Ariel K. Hayes
CAPLIN & DRYSDALE, CHARTERED
1200 New Hampshire Ave., N.W.
8th Floor
Washington, D.C. 20036
(202) 862-5000

David C. Frederick
Kathleen W. Hickey
Jared M. Stehle
KELLOGG, HANSEN, TODD, FIGEL
 & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Appellants*

May 20, 2025

AGATHA BUITRAGO; ANGELINA RASO; CHERIE A. CRAFT; CYNTHIA
FISHER; ANNA MARIE GERKEN; GLENDA THERESA GIROIR; DOROTHY
GOODE-EVANS; VERDA HANEY; ELAINE SCHLECHTER; DIANNE
TANTILLO; SUSAN SOARES; ANA DELGADO; REBECCA LATTERELL-
RICE; CARMEN ALARCON; HOWARD G. ANDOE; KAREN HOW;
MARTHA MCCRACKEN KING; LORRAINE PERKINS; ROBYN ROSS;
BETTY SCOTT; JOHN WANDSNEIDER; JUDY KAY BELL; RENEE FLAGG
PEREZ; ILONA KLAR; CYNTHIA SMITHERS; WESLEY REED; SUSAN
BETTS; CARLA FORSLUND; MARLANE HEARD; ALEKSANDRA
HUXLEY; MARILYN MACRON; LOUISE MILFORD; JOSEPHINE
NAVARETTA; MAUREEN SEAL; ANGELINA VESSIA-AYOUBI; SHERI
ADAMS; SHERYL DOBBS; CHRISTA RUTH MACHADO, Estate
Representative of ESTATE OF BARBARA J. KERSHNER; CHARLENE E.
RAND; JODY VALLEY,

*Appellants*,

– v. –

RML, LLC; REVLON GROUP HOLDINGS LLC; ELIZABETH ARDEN USC,
LLC; BRANDCO ALMAY 2020 LLC; ELIZABETH ARDEN, INC.; BRANDCO
CHARLIE 2020 LLC; FD MANAGEMENT, INC.; REVLON CONSUMER
PRODUCTS LLC; BRANDCO CND 2020 LLC; NORTH AMERICA REVSALE
INC.; OPP PRODUCTS, INC.; ALMAY, INC.; BRANDCO CURVE 2020 LLC;
RDEN MANAGEMENT, INC.; BRANDCO ELIZABETH ARDEN 2020 LLC;
ART & SCIENCE, LTD.; REALISTIC ROUX PROFESSIONAL PRODUCTS
INC.; ROUX LABORATORIES, INC.; BRANDCO GIORGIO BEVERLY HILLS
2020 LLC; REVLON DEVELOPMENT CORP.; ROUX PROPERTIES
JACKSONVILLE, LLC; BRANDCO HALSTON 2020 LLC; REVLON
GOVERNMENT SALES, INC.; SINFULCOLORS INC.; BRANDCO JEAN
NATE 2020 LLC; REVLON INTERNATIONAL CORPORATION; BARI
COSMETICS, LTD.; PPI TWO CORPORATION; RIROS GROUP INC.;
BEAUTYGE BRANDS USA, INC.; ELIZABETH ARDEN (CANADA)
LIMITED; BRANDCO PS 2020 LLC; BRANDCO WHITE SHOULDERS 2020
LLC; REVLON CANADA INC.; BEAUTYGE USA, INC.; CHARLES REVSON
INC.; BEAUTYGE II, LLC; CREATIVE NAIL DESIGN, INC.; CUTEX, INC.;
DF ENTERPRISES, INC.; ELIZABETH ARDEN (FINANCING), INC.;
ELIZABETH ARDEN INVESTMENTS, LLC; ELIZABETH ARDEN NM, LLC;
ELIZABETH ARDEN TRAVEL RETAIL, INC.; REVLON PROFESSIONAL
HOLDING COMPANY LLC; BRANDCO MITCHUM 2020 LLC; REVLON
(PUERTO RICO) INC.; RIROS CORPORATION; ELIZABETH ARDEN (UK)
LTD.; BRANDCO MULTICULTURAL GROUP 2020 LLC,

*Debtors-Appellees.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants are individuals with personal injury claims based on disease caused by asbestos-contaminated talc for which Revlon, Inc. or one or more of the above-captioned appellees are responsible.  Claimants are not subject to the disclosure provisions of Rule 26.1.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION...............................................................3

ISSUES FOR PRESENTED FOR REVIEW .................................................4

STATEMENT OF THE CASE...................................................................5

I.  The Bankruptcy Code Treats Future Asbestos Liability
    Uniquely..................................................................................5

    A.  General Discharge Provisions Under The Bankruptcy
        Code..............................................................................5

    B.  The Rise Of Asbestos Liability ............................................6

    C.  Enactment Of § 524(g)-(h) ..................................................9

II. Revlon's Bankruptcy Proceedings............................................12

    A.  Revlon's Pre-Bankruptcy Asbestos Liability.......................12

    B.  Revlon's Notice Program ...................................................13

    C.  Revlon's Final Reorganization Plan....................................15

III. Claimants' Asbestos Lawsuits...............................................16

SUMMARY OF ARGUMENT .................................................................18

STANDARD OF REVIEW ....................................................................21

ARGUMENT ....................................................................................21

ii

I.     Section 524(g) Provides The Exclusive Mechanism For Chapter 11 Reorganizing Debtors To Enjoin Future Asbestos Liability ...................21

     A.     The Code's Text And Structure Permit Discharging Future Asbestos Claims Only Pursuant To § 524(g)'s Process ...............................................................................22

          1.     Section 524(g)'s text sets out a comprehensive and specific scheme for future asbestos claims ..............................22

          2.     Section 524(g)'s presence in the Code's discharge provision establishes its exclusivity .........................26

          3.     Section 524(h) confirms § 524(g)'s role as the exclusive discharge provision for future asbestos claims ..................................................................31

     B.     Congress Intended § 524(g) To Govern The Discharge Of Future Asbestos Claims ..................................31

     C.     Congress Intended § 524(g) To Advance Important Policy Objectives In Protecting Future Claimants ............................33

     D.     The Bankruptcy Court Misinterpreted § 524(g)..................................35

          1.     The word "may" empowers courts, not debtors .......................35

          2.     Section 524(a) confers additional discharge authority not present in the general discharge provisions ..................................................................38

II.    Due Process Requires A Mechanism To Protect Future Claimants' Rights Beyond The General Discharge Provisions ...................39

     A.     Future Claimants Have A Due Process Right To Vindicate Their Claims .......................................................39

     B.     General Discharge Provisions Do Not Satisfy Due Process For Future Claimants ............................................41

iii

III. Even If Revlon Could Discharge Future Asbestos Liability Without § 524(g), Revlon's Notice Program Did Not Satisfy Due Process ........................................................................44

    A. Due Process Requires Adequate Notice To All Creditors .................45

    B. Revlon's Notice To Future Asbestos Claimants Was Insufficient ...........................................................................47

CONCLUSION ........................................................................49

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

Page

## CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................... 1, 7, 42

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ........................................................................ 5

*Celotex Corp.*, *In re*, 204 B.R. 586 (Bankr. M.D. Fla. 1996) ................................. 12

*Chateaugay Corp.*, *In re*:

944 F.2d 997 (2d Cir. 1991) .......................................................... 40

2009 WL 367490 (Bankr. S.D.N.Y. Jan. 14, 2009) ...................................... 30

*Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995) ......................................... 45

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
42 F.4th 1024 (9th Cir. 2022) ................................................................. 27-28

*Citizens & S. Nat'l Bank v. Bougas*, 434 U.S. 35 (1977) ................................. 28, 29

*Combustion Eng'g, Inc.*, *In re*, 391 F.3d 190 (3d Cir. 2004) ........................... 36, 43

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) ....................... 26, 28

*Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193
(2000) ......................................................................................... 27

*D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204 (1932) ............................... 25, 26

*Dana Corp.*, *In re*, 2008 WL 11404248 (S.D.N.Y. Sept. 30, 2008) ................. 29, 30

*DeJulius v. New England Health Care Emps. Pension Fund*,
429 F.3d 935 (10th Cir. 2005) ...................................................... 21

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145
(2d Cir. 2014) .............................................................................. 45

*Eagle-Picher Indus., Inc.*, *In re*, 203 B.R. 256 (S.D. Ohio 1996) ...........................12

*Energy Future Holdings Corp.*, *In re*, 949 F.3d 806 (3d Cir. 2020) ......................36

*Fed.-Mogul Glob. Inc.*, *In re*, 684 F.3d 355 (3d Cir. 2012)...............................31, 32

*Fidel v. Farley*, 534 F.3d 508 (6th Cir. 2008) ..........................................................21

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008)........................................................................................................................26

*Flintkote Co.*, *In re*, 486 B.R. 99 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014) ...............................................................12

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996)..............................42

*Grossman's, Inc.*, *In re*, 607 F.3d 114 (3d Cir. 2010) ............................................41

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) .......................5, 6, 25, 39

*Hecht v. United Collection Bur., Inc.*, 691 F.3d 218 (2d Cir. 2012) ......................46

*Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595 (2d Cir. 2021) .....................................21

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651 (2006)........................................................................................................................33

*Imerys Talc Am., Inc.*, *In re*, 38 F.4th 361 (3d Cir. 2022) ..............................7, 8, 33

*J.A. Jones, Inc.*, *In re*, 492 F.3d 242 (4th Cir. 2007) ..............................................45

*Johns-Manville Corp.*, *In re*:

    36 B.R. 727 (Bankr. S.D.N.Y. 1984) ..............................................................7

    36 B.R. 743 (Bankr. S.D.N.Y. 1984), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985)..........................................................................................8

    57 B.R. 680 (Bankr. S.D.N.Y. 1986) ..............................................................7

    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..............................................................8

600 F.3d 135 (2d Cir. 2010) ..........................................................46

551 B.R. 104 (S.D.N.Y. 2016) .......................................................43

2019 WL 5965205 (S.D.N.Y. Nov. 13, 2019) ................................34

2022 WL 4487889 (2d Cir. Sept. 28, 2022) ..................................44

*Jones v. Chemetron Corp.*, 212 F.3d 199 (3d Cir. 2000) ......................45

*Kaiser Gypsum Co.*, *In re*, 135 F.4th 185 (4th Cir. 2025) ................. 23-24

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ..........7, 8, 9, 10, 27, 34

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018)............................25

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ....................................20, 40

*Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) ...........................22

*Momentum Mfg. Corp.*, *In re*, 25 F.3d 1132 (2d Cir. 1994) ...................................30

*Motors Liquidation Co.*, *In re*, 829 F.3d 135 (2d Cir. 2016).....................................5

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306
(1950)...................................................... 20, 40, 44, 45, 46, 47, 48

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .......................................................1

*Placid Oil Co.*, *In re*, 753 F.3d 151 (5th Cir. 2014) ................................................30

*Quigley Co.*, *In re*:

346 B.R. 647 (Bankr. S.D.N.Y. 2006) ..........................................6

676 F.3d 45 (2d Cir. 2012) ..........................................................11

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639
(2012)...................................................................18, 24, 25, 26

*RML, LLC*, *In re*, 657 B.R 709 (Bankr. S.D.N.Y. 2023)...................................15, 48

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002) .........................................................................21

*SGL Carbon Corp.*, *In re*, 200 F.3d 154 (3d Cir. 1999) ..........................................10

*Stephenson v. Dow Chem. Co.*, 273 F.3d 249 (2d Cir. 2001), *aff'd in relevant part, rev'd in part*, 539 U.S. 111 (2003)...........................43

*Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004).................................6

*Toibb v. Radloff*, 501 U.S. 157 (1991).............................................................5, 33

*Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024) ...................25, 26, 34

*United States v. Chase*, 135 U.S. 255 (1890) ...........................................................38

*United States v. Nolan*, 136 F.3d 265 (2d Cir. 1998) ..............................................21

*United States v. Rodgers*, 461 U.S. 677 (1983) ........................................................28

*W. Asbestos Co.*, *In re*, 2021 WL 4156247 (Bankr. N.D. Cal. Sept. 13, 2021), *aff'd sub nom. In re W. Asbestos Settlement Tr.*, 2022 WL 4372359 (N.D. Cal. Sept. 21, 2022)...............................12

*W.R. Grace & Co.*, *In re*, 13 F.4th 279 (3d Cir. 2021) ...........................................12

*Waterman S.S. Corp.*, *In re*, 141 B.R. 552, 559 (Bankr. S.D.N.Y. 1992), *vacated and remanded, aff'd in relevant part*, 157 B.R. 220 (S.D.N.Y. 1993).................................................................... 46-47

*Yoo v. United States*, 43 F.4th 64 (2d Cir. 2022).....................................................27

## STATUTES AND REGULATIONS

U.S. Const. amend. V.................................................................................39

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111, 108 Stat. 4106 ........................................................................31

Bankruptcy Code, 11 U.S.C. §§ 101-1330:

§ 341(a) ........................................................................................5

§ 502(b)(9) ...................................................................................5

§ 521(a)(1) ...................................................................................5

§ 521(a)(1)(B)(iii) .......................................................................5

§ 524 ....................................................................................26, 27

§ 524(a) ................................................................................25, 37

§ 524(a)(1) ...................................................................................6

§ 524(a)(2) ...................................................................................6

§ 524(g) ...............................................................................*passim*

§ 524(g)(1)(A) ........................................................19, 22, 23, 37

§ 524(g)(1)(B) ............................................................................10

§ 524(g)(2)(B) ......................................................19, 22, 23

§ 524(g)(2)(B)(i)(I) .............................................11, 23, 24

§ 524(g)(2)(B)(i)(II) .................................................11, 23

§ 524(g)(2)(B)(i)(III)(bb) .................................................34

§ 524(g)(2)(B)(i)(IV) ................................................11, 23

§ 524(g)(2)(B)(ii)(III) ...............................................11, 34

§ 524(g)(2)(B)(ii)(IV)(bb) .........................................23, 43

§ 524(g)(2)(B)(ii)(V) ........................................................43

§ 524(g)(4)(B) .................................................................19

§ 524(g)(4)(B)(i) ..................................................11, 23, 34, 43

§ 524(g)(4)(B)(ii) ................................................11, 23, 37, 40

§ 524(h) ....................................................................9, 11, 31

§ 524(h)(1)(B) ...................................................................31

§ 541(a) .............................................................................5

§ 1125 ...............................................................................6

§ 1129(a) ...........................................................................6

§ 1129(b) ...........................................................................6

§ 1141(a) ...........................................................................6

§ 1141(d) ..........................................................................19

§ 1141(d)(1) ........................................................................6

12 U.S.C. § 94 ..................................................................28

28 U.SC.:

§ 157(a) .............................................................................3

§ 158(d) .............................................................................4

§ 158(d)(2) .........................................................................4

§ 158(d)(2)(b) .....................................................................3

§ 1334(a) ............................................................................3

§ 1411(a) ..........................................................................41

Fed. R. Civ. P. 23 .............................................................42

Bankr. R. 3003(c)(3) .........................................................36

**LEGISLATIVE MATERIALS**

140 Cong. Rec. S4523 (daily ed. Apr. 20, 1994)......................................33

140 Cong. Rec. 27692 (1994) ...................................................................9, 10

140 Cong. Rec. 28358 (1994) ...........................................................................9

H.R. Rep. No. 103-835, *reprinted in* 1994 U.S.C.C.A.N. 3340
    (1994)......................................................................9, 10, 31, 32, 33

S. Rep. No. 95-989 (1978) .............................................................................10

**OTHER AUTHORITIES**

4 *Collier on Bankruptcy* (16th ed. 2025) ..................................................43

Michael A. Francus, *Designing Designer Bankruptcy*,
    102 Tex. L. Rev. 1205 (2024) .........................................................12

Denise Gellene, *Revlon Buys Several Fragrance Brands*, L.A.
    Times (June 17, 1987) ......................................................................47

## **INTRODUCTION**

A confirmation of a debtor's plan of reorganization under chapter 11 of the Bankruptcy Code, and the resulting injunction, ordinarily confirm that the creditors have obtained the most value they can receive from a debtor's estate in exchange for finality as to claims against the debtor. The basic bargain of debtor finality versus creditor maximization of value, however, raises special problems when applied to debtors whose products contained asbestos. The long latency of asbestos-related harms means that numerous individuals will have claims that could not be known until years after a debtor is discharged from bankruptcy. Discharging a potential future claimant's claims in a bankruptcy raises substantial notice and due process problems that the Supreme Court has long recognized. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 847 n.23, 860 n.34 (1999). For these reasons, reorganizations involving asbestos liabilities are different, and the Bankruptcy Code treats them differently.

In this case, Revlon chose to omit a critical detail in its plan of reorganization: provision for future claimants who had been exposed to asbestos from Revlon's products but whose illnesses did not manifest before the bankruptcy ended. Only after Plan confirmation did some future claimants with asbestos claims ("Claimants") emerge to bring lawsuits against Revlon, because it was only

after confirmation that these victims learned they had a claim.  But the court below treated the Plan's confirmation and the resulting discharge as an irrevocable event that snuffed out the Claimants' lawsuits notwithstanding:  (1) the existence of a specific statutory provision to protect future claimants harmed by asbestos in 11 U.S.C. § 524(g); (2) no process for the future claimants to have raised their potential claims against Revlon before the alleged discharge occurred; and (3) the absence of any mention of "talc," "asbestos," or any specific Revlon product containing such dangers in the notice Revlon purported to give through publication.

Each of those errors warrants reversal.  The Bankruptcy Court erred in disregarding § 524(g) because Revlon's Plan of Reorganization did not provide an alternative provision protecting the creditor rights of future claimants.  Though dozens of asbestos debtors have satisfied § 524(g)'s requirements over the 30 years since its enactment, Revlon chose instead to bypass all these protections and declare a total release from all future claims.  The resulting violation of the Code led to the Plan violating the due process rights of future claimants who had no means to assert their claims in the bankruptcy.  The Plan also violated due process by failing to give adequate notice to the future claimants.  Claimants could not reasonably assert a claim in this bankruptcy because their asbestos exposure had not manifested into a disease, and the notice provided no information sufficient to

2

apprise them that they needed to do so. Accordingly, the judgment should be reversed and the case remanded to enable Claimants an opportunity to litigate their claims.

## STATEMENT OF JURISDICTION

This appeal arises from the chapter 11 bankruptcy reorganization of Revlon, Inc. and its affiliated debtors (collectively, "Revlon") pending before the United States Bankruptcy Court for the Southern District of New York (Jones, J.). The Bankruptcy Court had subject-matter jurisdiction over Revlon's bankruptcy cases in accordance with 28 U.S.C. §§ 157(a) and 1334(a).[1]

On August 12, 2024, the Bankruptcy Court granted Revlon's motion to enjoin the Claimants from continuing their asbestos-talc personal injury claims against Revlon.[2] On August 26, 2024, Claimants filed a timely notice of appeal[3] and subsequently moved to certify a direct appeal to this Court under 28 U.S.C. § 158(d)(2)(b).[4] On September 23, 2024, the Bankruptcy Court granted Claimants'

---

[1] Citations to *In re Revlon Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y.), appear as "*Revlon* ECF No. __." Citations to *In re RML LLC*, No. 22-10784 (DSJ) (Bankr. S.D.N.Y.), appear as "Bankr. ECF No. __."

[2] *See* Decision on Reorganized Debtors' Second Omnibus Motion To Enforce the Plan Injunction ("Bankruptcy Decision"), Bankr. ECF No. 1107 (JA___-__).

[3] Bankr. ECF No. 1125 (JA___-__).

[4] Bankr. ECF No. 1137.

request for certification under 28 U.S.C. § 158(d)(2).[5]  On October 23, 2024,

Claimants sought certification for this Court of a direct appeal,[6] which this Court

granted on February 4, 2025.  Accordingly, jurisdiction is proper under 28 U.S.C.

§ 158(d).

## ISSUES PRESENTED FOR REVIEW

1.     Whether 11 U.S.C. § 524(g), the only provision of the Bankruptcy

Code that authorizes the release of future asbestos-related claims, supplies the

exclusive statutory mechanism for a debtor to discharge known future asbestos

liabilities through a chapter 11 bankruptcy reorganization.

2.     Whether due process requires debtors in a chapter 11 bankruptcy

reorganization to take separate measures beyond those set out in the general

discharge provisions to protect the rights of future asbestos claimants—such as

creating a trust with funding for future claimants and appointing a future claims

representative—for the debtor to discharge future asbestos liability.

3.     Whether the notice provided by Revlon provided asbestos-talc

claimants whose diseases had not manifested before the Plan took effect with

---

[5] Decision and Order Granting Motion for Certification of Direct Appeal, Bankr. ECF No. 1155 at 3, 5 (JA___, ___).

[6] *Certain Post-Bankruptcy Talc Claimants v. RML, LLC*, No. 24-02843 (2d Cir. 2024), ECF No. 1.

sufficient due process to make the discharge of their claims effective in a chapter 11 bankruptcy reorganization.

### STATEMENT OF THE CASE

**I.      The Bankruptcy Code Treats Future Asbestos Liability Uniquely**

**A.      General Discharge Provisions Under The Bankruptcy Code**

Chapter 11 of the Bankruptcy Code aims to "preserv[e] going concerns and maximiz[e] property available to satisfy creditors." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (citing *Toibb v. Radloff*, 501 U.S. 157, 163 (1991)).  Chapter 11 cases begin with the filing of a bankruptcy petition and disclosures of the details of a debtor's financial condition. 11 U.S.C. § 521(a)(1).  The filing of a bankruptcy petition "creates an estate" of the debtor's assets, including "all [its] legal or equitable interests." *Id.* § 541(a).

The debtor then "work[s] with its creditors to develop a reorganization plan governing the distribution of the estate's assets." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 214 (2024).  Debtors generally provide creditors with notice of the case and a deadline to file claims, also known as the "bar date."  *See* 11 U.S.C. §§ 341(a), 521(a)(1)(B)(iii), 502(b)(9).  Bankruptcy courts may issue a "bar date order" that sets both the bar date and the manner of notice for certain creditors that their claims will soon be barred if they do not file a proof of claim by that date. *See In re Motors Liquidation Co.*, 829 F.3d 135, 168 (2d Cir. 2016); *see also*

5

*Revlon* ECF No. 688 ("Bar Date Order") (JA___-__).  A bar date need not apply to all creditors.  *See*, *e.g.*, *In re Quigley Co.*, 346 B.R. 647, 651 (Bankr. S.D.N.Y. 2006) (noting that "the Court ordered the Asbestos [personal injury] Claimants holding un-liquidated claims *not* to file proofs of claim in [the] bankruptcy").

Ultimately, the plan of reorganization is voted on by affected creditors. 11 U.S.C. § 1125.  A bankruptcy court shall confirm a plan of reorganization only if it complies with certain requirements under the Code, including that at least one class of impaired creditors votes to accept the reorganization plan, and that the bankruptcy court finds the plan is "fair and equitable" with respect to the other impaired classes.  *See id.* § 1129(a)-(b).

Once confirmed, the plan generally "discharges the debtor from any debt that arose before" that point.  *Id.* § 1141(d)(1).  The confirmed plan typically "binds the debtor and its creditors going forward—even those who did not assent to the plan."  *Harrington*, 603 U.S. at 214 (citing § 1141(a)).  The discharge also usually "operat[es] as an injunction . . . prohibit[ing] creditors from attempting to collect or to recover the debt."  *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) (citing 11 U.S.C. § 524(a)(1), (2)).

## B.    The Rise Of Asbestos Liability

The rise of asbestos-related disease threw a wrench into the chapter 11 scheme.  Asbestos-related harms have a long latency period, meaning they may not

6

manifest for decades after exposure. Because of that latency period, "a continuing stream of claims can be expected" for debtors facing asbestos liability. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997).

Asbestos-driven bankruptcies therefore created difficulties for both debtors and future creditors. "[A] reorganization plan that failed to account for future asbestos liabilities would be of limited utility to the debtor, and likewise, a reorganization plan that did not address future claimants would fail to provide adequately for all parties with an interest in the debtor's assets." *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 366 (3d Cir. 2022). But as originally enacted, the Code's general discharge provisions did not account for debtors with a long tail of future liabilities from asbestos harms that had not yet manifested.

A landmark case came in 1982, with the bankruptcy of a prominent asbestos manufacturer, the Johns-Manville Corporation. By then, Johns-Manville was a "financially besieged enterprise in desperate need of reorganization of its crushing debt, both present and future." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 741 (Bankr. S.D.N.Y. 1984)); *see also In re Johns-Manville Corp.*, 57 B.R. 680, 682 (Bankr. S.D.N.Y. 1986).

That bankruptcy was haunted by the specter of future claimants whose exposure to Johns-Manville's products occurred before the filing (or

7

"prepetition"), but who "may be unaware of their entitlement to recourse against Manville due to the latency period of . . . asbestos related diseases." *In re Johns-Manville Corp.*, 36 B.R. 743, 745 (Bankr. S.D.N.Y. 1984), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985). To the *Manville* court, "[i]t [wa]s abundantly clear that the Manville reorganization [would] have to be accountable to future asbestos claimants whose compelling interest must be safeguarded." *Id.* at 744.

This thorny problem inspired a solution. The *Manville* "reorganization process introduced a novel mechanism for dealing with these issues: a trust designed to compensate present and future asbestos claimants, coupled with an injunction against future asbestos liability." *Imerys Talc*, 38 F.4th at 366; *see also Kane*, 843 F.2d 636. "The combination of the trust and injunction allowed the debtor to emerge from bankruptcy without the uncertainty of future asbestos liabilities hanging over its head, while ensuring claimants would not be prejudiced just because they had not yet manifested injuries at the time of the bankruptcy." *Imerys Talc*, 38 F.4th at 366.

In particular, the channeling injunction protected "due process" rights of future claimants: "those parties, who by an accident of their disease cannot even speak in their own interest." *In re Johns-Manville Corp.*, 68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986). The result was a trust that Manville paid into both immediately and over time (including up to 20% of its yearly profits) to satisfy present and

8

future asbestos creditors, in exchange for the channeling injunction's valuable benefits.  *See Kane*, 843 F.2d at 640, 649-50.

Still, the legality of a bankruptcy plan barring future claimants from pursuing claims against the reorganized Manville remained in doubt.  This uncertainty so clouded the bankruptcy that "the securities of these reorganized companies" remained "discounted because of . . . fear of unknown asbestos liabilities."  140 Cong. Rec. 28358 (1994) (statement of Sen. Brown).

### C.    Enactment Of § 524(g)-(h)

Congress recognized "lingering uncertainty" that followed the *Manville* reorganization and "remain[ed] concerned that full consideration be accorded to the interests of future claimants, who, by definition, do not have their own voice." H.R. Rep. No. 103-835, at 40, *reprinted in* 1994 U.S.C.C.A.N. 3340 (1994). Congress enacted 11 U.S.C. § 524(g)-(h) of the Bankruptcy Code in 1994 to address the problems posed by asbestos-driven bankruptcies.  It therefore "modeled" § 524(g) after the *Manville* plan, so that all entities facing known future asbestos liabilities could seek relief through bankruptcy.  140 Cong. Rec. 27692 (1994).

Section 524(g) codified the *Manville* bankruptcy court's careful solution to the challenge of equitably allocating Manville's limited, inadequate funds among present and future claimants.  This section made the Manville trust/injunction

mechanism "available for use by any asbestos company facing a similarly overwhelming liability."  H.R. Rep. No. 103-835, at 40-41; *see also Kane*, 843 F.2d at 640 (purpose of Manville Trust is to satisfy personal injury asbestos liability while also allowing Manville to maximize its value for creditors by continuing as a going concern in the face of "crippling" lawsuits); S. Rep. No. 95-989, at 9 (1978), *cited in In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) (chapter 11 is intended to deal "with the reorganization of a financially distressed enterprise").

Congress intended the new provisions of the Code to establish the legality of "asbestos trust/injunction mechanisms that meet the same kind of high standards with respect to regard for the rights of claimants, present and future, as displayed in" *Manville*.  140 Cong. Rec. 27692.  As Congress explained, the *Manville* structure protects the rights of future claimants, because the "bankruptcy court appointed a special representative for the future claimants" and the "special representative was centrally involved in formulating the plan and negotiating support for it among the other creditors."  H.R. Rep. No. 103-835, at 40.

Like in *Manville*, § 524(g) authorizes a bankruptcy court to issue a "channeling injunction" that ends asbestos litigation (present and future) against the reorganized debtor, but only on certain conditions.  *See* 11 U.S.C. § 524(g)(1)(B).  The debtor must establish and (at least partly) fund a trust that

assumes its asbestos liabilities, and the debtor must propose a bankruptcy plan empowering the trust "to pay claims and demands."  *Id.* § 524(g)(2)(B)(i)(I), (II), (IV).  The conditions also include protections for future claimants due to the long latency of asbestos-related illness, including the appointment of a representative to advance their interests and a supermajority voting rule calling for the approval of 75% of current asbestos claimants.  *Id.* § 524(g)(4)(B)(i), (ii); *see also id.* § 524(g)(2)(B)(ii)(III).  The debtor must also show that a bankruptcy without the channeling injunction for future claims "is likely to threaten the plan's purpose to deal equitably with claims and future demands."  *Id.* § 524(g)(2)(B)(ii)(III).

A company that emerges from bankruptcy under a § 524(g) plan benefits from an injunction channeling all past *and* future asbestos lawsuits against the reorganized company to the trust instead.  *In re Quigley Co.*, 676 F.3d 45, 48 (2d Cir. 2012) ("Section 524(g) authorizes bankruptcy courts . . . to enter . . . an injunction channeling certain classes of claims to a trust set up in accordance with the plan.").  This result was unthinkable before *Manville* and § 524(g).  As a companion to § 524(g), Congress also enacted § 524(h), protecting "reliance interests" in asbestos-related channeling injunctions and trusts like *Manville*, established before § 524(g) was enacted.  Under § 524(h), an asbestos trust and channeling injunction established prior to § 524(g)'s enactment enjoys the same statutory protections as those granted under § 524(g).  *See* 11 U.S.C. § 524(h).

11

Since the enactment of § 524(g) more than 30 years ago, many companies facing overwhelming current and future asbestos liabilities have qualified for a channeling injunction under this statutory mechanism. *See*, *e.g.*, *In re W.R. Grace & Co.*, 13 F.4th 279 (3d Cir. 2021); *In re W. Asbestos Co.*, 2021 WL 4156247 (Bankr. N.D. Cal. Sept. 13, 2021), *aff'd sub nom. In re W. Asbestos Settlement Tr.*, 2022 WL 4372359 (N.D. Cal. Sept. 21, 2022); *In re Celotex Corp.*, 204 B.R. 586 (Bankr. M.D. Fla. 1996); *In re Flintkote Co.*, 486 B.R. 99, 124 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014); *In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 281 (S.D. Ohio 1996). "[D]ozens of asbestos bankruptcies [have] used § 524(g), and tens of billions of dollars of assets [have been] placed in Manville Model trusts to compensate tort victims," both present and future. Michael A. Francus, *Designing Designer Bankruptcy*, 102 Tex. L. Rev. 1205, 1209 (2024).

## II. Revlon's Bankruptcy Proceedings

### A. Revlon's Pre-Bankruptcy Asbestos Liability

When Revlon filed for bankruptcy in 2022, it knew it faced liability from its sale of cosmetic talc products that contained asbestos. Revlon faced personal injury claims "relating to 'Jean Nate' branded products," including body powder containing asbestos-contaminated talc.[7] Revlon's initial petition disclosed millions

---

[7] Disclosure Statement for First Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code ("Disclosure Statement"), *Revlon* ECF No. 1511 § V.R at 47 (JA___).

of dollars of settled but unpaid asbestos-talc claims related to these products.[8]

Revlon's eventual Disclosure Statement estimated these asbestos liabilities to total

between $50 and $150 million. *See* Disclosure Statement at 6, § I.C (JA___).

Revlon also disclosed that it faced liability for non-asbestos claims related to

other products, such as hair relaxers allegedly linked to increased risks of uterine

cancer. *See id.* § V.R at 47 (JA___). Revlon sought to discharge all current and

future liability from both asbestos and hair relaxer claims through its chapter 11

bankruptcy. *See id.* § XII.A at 179 (JA___).

## B. Revlon's Notice Program

Although Revlon intended to discharge its future asbestos liability, Revlon

opted to ignore the only mechanism provided by Congress to do that. To start,

Revlon sought a generic bar date order and notice that swept in future asbestos

claims with nearly all other claims. Revlon's general Bar Date provided no

exception for future asbestos claimants—they, like other creditors, had to

"properly file a Proof of Claim on or before the applicable Bar Date." Bar Date

Order at 2 (JA___). The Bar Date Order, however, acknowledged Revlon's future

talc asbestos liability, providing that claimants could file a "timely" proof of claim

after the Bar Date but prior to the confirmation date "*provided* that such disease

---

[8] Voluntary Petition for Non-Individuals Filing Bankruptcy (Bankr. S.D.N.Y. June 15, 2022) at 11. *Revlon* ECF No. 1.

13

was diagnosed by a licensed medical doctor for the first time after the Petition Date." *Id.* at 3 (JA___). The Bar Date Order made no provision for talc claims that arose after confirmation.

In September 2022, Revlon published a general bar date notice ("Notice") in three publications to purportedly apprise unknown creditors of the bar date: in the business section of the *New York Times* and *USA Today*, and in the back of the news section of the *Globe and Mail*. *Revlon* ECF No. 758 (JA___-__). Each Notice ran in each paper for one day. *See id.* Unknown creditors necessarily include future claimants who do not yet know they have suffered asbestos-related harms from Revlon's products.

Revlon did not tailor the Notice to reach the many consumers who may have suffered exposure to its asbestos-contaminated talc products. *See* Notice. The Notice did not mention talc products at all. *See id.* It did not mention asbestos. *See id.* It did not mention brands associated with those asbestos-contaminated talc claims—such as Jean Nate, *see id.*—even though Revlon knew these brand names well. It employed no informative graphics, included no images of those products, and eschewed use of bold, large typeface. *See* Notice. Nothing about the Notice suggested that the bankruptcy might affect a user of Revlon's talc products at all.

By contrast, Revlon gave special treatment to claims related to its hair relaxer products. For these claims only, Revlon established a separate bar date and

an elaborate, extensive notice program. Order (I) Establishing Supplemental Deadline for Submitting Hair Straightening Proofs of Claim, (II) Approving the Notice Thereof, and (III) Granting Related Relief, *Revlon* ECF No. 1574 at 2 (JA___). Unlike for asbestos claims, the hair relaxer notice "included a digital advertising and social media campaign designed to reach the relevant consumer audience," even using "the Facebook and Instagram social media platforms for notice messages that would be automatically translated into Spanish" for certain readers. *In re RML, LLC*, 657 B.R 709, 722 (Bankr. S.D.N.Y. 2023). Revlon also published notice of the specific hair relaxer bar date in the national editions of the *New York Times* and *USA Today*, and the national edition of the *Globe and Mail* in Canada. The bankruptcy court found that Revlon's special hair-relaxer notice campaign "was seen by 17,000 users." *Id.*

### C. Revlon's Final Reorganization Plan

Like its notice program, Revlon's final Plan did not account for future asbestos claimants. Instead, the Plan established a small settlement fund earmarked only for *current* talc personal injury claims. *Revlon* ECF No. 1860 at 71 (JA___). By design, that fund has a limited duration; it pays current talc claims filed by the bar date and then is dissolved. *See Revlon* ECF No. 1865 § 6.2(b) (JA___-__). That fund sets aside millions for already-filed talc asbestos claims. *See* Disclosure Statement § XII.A at 179 (Risk Factors) (JA___).

While the Plan acknowledged that future claims existed, it did not include a future claims representative or seek to meet any of § 524(g)'s criteria to address future claims. This was so even though Revlon disclosed as a risk factor that claimants "may assert in the future certain liability claims . . . related to the presence of talc in certain products." *Id.* They also kept their insurance policies in place to cover future talc personal injury claims that "may not be discharged under the Plan." *Id.* § V.R. at 48 (JA___).

The Bankruptcy Court confirmed the Plan on April 3, 2023. *Revlon* ECF No. 1746 (JA___-__). The effective date ("Effective Date") of the Plan was May 2, 2023. *Revlon* ECF No. 1869 (JA___-__).

## II. Claimants' Asbestos Lawsuits

Claimants suffer from asbestos-caused cancer that arose from prepetition product use but manifested only after the Effective Date of the bankruptcy (which, by definition, is after confirmation). *See* Bankr. ECF No. 1064 (JA___-__). Each Claimant filed an individual tort lawsuit against Revlon after becoming aware of his or her asbestos-related injury. *See* Bankr. ECF No. 1051. Revlon moved in June 2024 to enforce the Plan's discharge and injunction provisions against Claimants. *See* Bankr. ECF No. 960. It sought an order requiring Claimants to dismiss their claims against Revlon within 14 days, threatening Claimants with sanctions if they did not drop the claims. *See id.* at 2.

16

Claimants argued that the Plan's discharge and injunction are not enforceable against them. *See* Bankr. ECF No. 1051 at 6. They raised three main arguments. First, § 524(g) represents the exclusive provision for addressing and resolving future asbestos claims through a chapter 11 reorganization. *Id.* Revlon chose not to deploy that tool, so it cannot enjoy its benefits. Second, due process requires that future asbestos claimants contemplated by § 524(g) could not have their claims discharged or enjoined through the Code's general discharge provisions. *Id.* at 6-9. Third, even if § 524(g) did not provide the exclusive mechanism to grant such a release in a chapter 11 reorganization, Revlon's generic notice program did not satisfy due process as to future asbestos claimants. *Id.* at 9-18.

The Bankruptcy Court granted Revlon's enforcement motion. *See* Bankruptcy Decision (JA___-__); Bankr. ECF No. 1110 ("Enforcement Order") (JA___-__). The Bankruptcy Court concluded that § 524(g) is optional, and debtors need not comply with § 524(g) to discharge their asbestos-related claims under a chapter 11 plan of reorganization. Bankruptcy Decision at 11 (JA___). The Bankruptcy Court further held that general discharge provisions in the Code can discharge future asbestos claims. *Id*. The Bankruptcy Court also held that the law entitled Claimants only to publication notice, and the Reorganized Debtors'

17

publication satisfied due process despite not being tailored, and despite the absence of any talc- or asbestos-specific language. *Id.* at 13, 23 (JA___, ___).

This appeal followed.

## SUMMARY OF ARGUMENT

Only § 524(g) of the Bankruptcy Code authorizes a discharge of future asbestos claims, and only if its requirements are satisfied. That statute—and that statute alone—permits a reorganizing chapter 11 debtor overwhelmed by asbestos liabilities to channel future asbestos claims to a distributing trust. Congress enacted § 524(g) to address the unique due process concerns posed by latent asbestos injuries. This specific statutory scheme provides the exclusive roadmap for any debtor seeking to shed future asbestos liability through bankruptcy reorganization. Because Revlon did not follow that path, it may not enjoin Claimants' asbestos claims.

The text and structure of the Code compel this conclusion. Section 524(g) sets out a "comprehensive scheme" targeted specifically at future asbestos liability. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). The provision applies only to a debtor "which at the time of entry of the order for relief has been named as a defendant" for asbestos exposure and authorizes relief from future asbestos claims only upon strict conditions: the formation of a trust, appointment of a future claimants' representative, approval by a 75 percent vote of

18

current claimants, and a judicial finding that the outcome is "fair and equitable" to future claimants. *See* 11 U.S.C. § 524(g)(2)(B), (g)(4)(B).

A court "may" issue an injunction discharging future asbestos liability only if a debtor satisfies these conditions. *Id.* § 524(g)(1)(A). The statute's permissive phrasing governs only the exercise of judicial discretion after the debtor meets these conditions—the statutory price of releasing claims held by individuals who have not yet fallen ill with asbestos-related diseases. It does not allow a debtor to sidestep those conditions altogether. Legislative history surrounding the enactment of § 524(g) confirms this reading.

The Bankruptcy Court's contrary reasoning is flawed. It mistook the permissive "may" in § 524(g) as a license to disregard the statute entirely. It relied on § 1141(d)'s general discharge language while ignoring § 524(g)'s tailored rules for asbestos liability—precisely the inversion the general/specific canon forbids. And it gave no meaningful weight to the fact that Revlon's plan omitted all of § 524(g)'s required protections for future claimants: no § 524(g) trust, no future claims representative, and no finding that the Plan would deal equitably with future claimants. The result is a discharge that wrongly purports to bind people who had no notice and no process for adjudicating their interests, which leaves Congress's vision for future asbestos claimants by the wayside.

That result also contravenes due process. Future asbestos claimants hold property interests in their state-law tort claims, and courts cannot extinguish those interests without due process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429 (1982). Those fundamental protections explain why Congress built § 524(g) the way it did. Without a statutory mechanism to protect their rights in the chapter 11 process, future claimants sit defenseless—unrepresented, unheard, and cut off from remedies before their rights are known or have even ripened. By refusing to follow the only path Congress set out to discharge future asbestos claims, Revlon reorganized, but it cannot sacrifice the due process rights of those who were not yet before the court.

Even if it were possible to sidestep § 524(g) while complying with due process for future claimants, the Reorganized Debtors made no real effort to do so. Their perfunctory publication notice failed even the most basic test of fairness, precisely the sort of "mere gesture" that cannot stand in for due process. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950). Revlon's notice program said nothing of asbestos, talc, or the products at issue, and was not tailored to reach the relevant group of victims. It also provided no clue that future personal injury claims might be discharged. These omissions rendered the notice ineffective for its most critical audience—people who did not yet know they were injured.

20

This Court should reverse.

## STANDARD OF REVIEW

This Court's "review of the bankruptcy court's order, which involves a pure question of law, is *de novo*." *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 600 (2d Cir. 2021). Questions of law include "matter[s] of statutory interpretation," such as whether chapter 11 debtors must follow the requirements of § 524(g) to release future asbestos claims. *United States v. Nolan*, 136 F.3d 265, 271 (2d Cir. 1998). The question whether publication notice provides sufficient due process likewise garners *de novo* review. *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1186 (10th Cir. 2002) ("Due process issues, which call for legal conclusions, are subject to *de novo* review.") (citation omitted); *cf. Fidel v. Farley*, 534 F.3d 508, 513 (6th Cir. 2008) ("[W]hether a particular class action notice program satisfies the requirements of . . . the Due Process Clause is a legal determination we review *de novo*.") (quoting *DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 942 (10th Cir. 2005)).

## ARGUMENT

### I. Section 524(g) Provides The Exclusive Mechanism For Chapter 11 Reorganizing Debtors To Enjoin Future Asbestos Liability

Chapter 11 provides only one option for debtors to enjoin future asbestos claims: § 524(g). The text and structure of chapter 11's discharge provisions confirm that § 524(g) provides the exclusive mechanism for a debtor to obtain this

relief. Legislative history substantiates that Congress codified the *Manville* plan as the exclusive means to address future asbestos liabilities. The contrary outcome—allowing companies to discharge major asbestos liability through general discharge provisions that do not account for those claims—would render § 524(g) useless and undermine the purposes of the Bankruptcy Code. Taken together, these points establish § 524(g) as the sole roadmap to address these claims in a chapter 11 reorganization. The Bankruptcy Court erred in its contrary reading of § 524(g).

### A. The Code's Text And Structure Permit Discharging Future Asbestos Claims Only Pursuant To § 524(g)'s Process

#### 1. Section 524(g)'s text sets out a comprehensive and specific scheme for future asbestos claims

The text of § 524(g) sets out a specific statutory scheme for chapter 11 reorganizations that seek to discharge future asbestos claims. Under § 524(g)(1)(A), a bankruptcy court "may issue, in connection with [a confirmation] order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge" of other claims. Section 524(g)(2)(b) allows a court to issue such an injunction when certain "requirements of this subparagraph" are met. In other words, a court may "authorize[] releases in asbestos cases" under § 524(g) only "*when specified conditions are satisfied*." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (emphasis added).

Section 524(g)(2)(B) lists those specific conditions. The debtor must have "been named as a defendant" in a personal injury, wrongful death, or property damage case involving asbestos. 11 U.S.C. § 524(g)(2)(B)(i)(I). The debtor must establish and (at least partly) fund a trust that assumes its asbestos liabilities, and the debtor must propose a bankruptcy plan empowering the trust "to pay claims and demands." *Id.* § 524(g)(2)(B)(i)(I), (II), (IV). The plan creating the trust must win approval from "at least 75 percent of those voting." *Id.* § 524(g)(2)(B)(ii)(IV)(bb). The bankruptcy court must "appoint[] a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands." *Id.* § 524(g)(4)(B)(i). The court must also determine that imposing the injunction on future claimants would be "fair and equitable with respect to the persons that might subsequently assert such demands." *Id.* § 524(g)(4)(B)(ii).

Even if a bankruptcy satisfies all these conditions, the bankruptcy court need not grant § 524(g)'s extraordinary relief. A court "*may* issue" an "injunction" under § 524(g)(1)(A), if the debtor does right by future claimants. Or a court may decide in its own equitable discretion that § 524(g)'s channeling injunction does not fit the circumstances of the case, so the debtor cannot enjoin and channel future asbestos claims. Debtors may also wish to "pass through" their future asbestos claims if insurance will cover them. *See*, *e.g.*, *In re Kaiser Gypsum Co.*, 135 F.4th

23

185, 190 (4th Cir. 2025) (approving a plan that authorized the debtor to pass through insured asbestos claims into the tort system). The "may" language preserves that discretion.

These specific asbestos provisions override the more general discharge provisions in the Bankruptcy Code. "It is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up). The Supreme Court applied this canon to the Bankruptcy Code in *RadLAX*, explaining that, when "a general authorization and a more limited, specific authorization exist side-by-side," the more specific authorization controls. *Id.* "That is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.* (citation omitted).

Just so here. Section 524(g) creates a "comprehensive scheme" that "deliberately targeted" a "specific problem[ ]" (future asbestos liability) with a "specific solution[ ]" (codification of the *Manville* plan). *Id.* Congress tailored § 524(g) narrowly, permitting its use only for "a debtor which . . . has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos." 11 U.S.C. § 524(g)(2)(B)(i)(I). Put differently, it aims at "unique challenges" that "[c]ompanies filing for bankruptcy because of asbestos liability

24

face," including their "unknown future liability." *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 273 (2024). This section operates specifically "[f]or asbestos-related bankruptcies—and only for such bankruptcies," and thus marks "a notable exception to the code's general rules." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 222 (2024).

By contrast, the general discharge provision covers a "broad" scope of "provisions for the discharge of debts." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 715 (2018); *see also* 11 U.S.C. § 524(a) ("A discharge in a case under [the bankruptcy code] . . . voids any judgment at any time obtained" for debts "discharged under section 727, 944, 1141, 1192, 1228, or 1328 of this title, whether or not discharge of such debt is waived").

Section 524(g), then, implicates the rule that "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *RadLAX*, 566 U.S. at 646 (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). Although the Code contains a general provision for discharge of claims, future asbestos claims are "specifically dealt with" just down the page "in another part of the same enactment." *Id.* Under the general/specific canon, the more specific section controls.

The general/specific canon also helps avoid creating "the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'" *Id.* at 645 (quoting *D. Ginsberg & Sons*, 285 U.S. at 208). To read the statute as allowing the general discharge provisions to apply to future asbestos liability would "render part of the statute entirely superfluous, something [courts] are loath to do." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166 (2004). "There is no reason why Congress would bother to specify conditions under which a person may [discharge future asbestos claims], and at the same time allow [discharge] absent those conditions." *Id.* This Court should not read the statute to create such an implausible result.

### 2. Section 524(g)'s presence in the Code's discharge provision establishes its exclusivity

The broader context of the Code's general discharge provisions underscores § 524(g)'s role—to detail how the discharge scheme handles known future asbestos liability. Congress included § 524(g) as part of § 524—the section of the Code that addresses discharge generally. Like chapter 11 more broadly, § 524 strikes "a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate." *Truck Ins. Exch.*, 602 U.S. at 272 (quoting *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008)).

26

The codification of the *Manville* plan at § 524(g) advanced those same two purposes. From the beginning, the *Manville* plan served to "provide a means of satisfying Manville's ongoing personal injury liability while allowing Manville to maximize its value by continuing as an ongoing concern." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988). To accomplish those goals on an "ongoing" basis, the plan—and, today, § 524(g)—helps ensure future claimants are "treated identically to the present claimants," creating parity among the creditors and fairness between the creditors and debtor. *Id.* By adopting the *Manville* plan, Congress endorsed and codified a particular balance of those interests by creating a specific statutory scheme, placed within the broader discharge scheme. To bypass that mechanism and enjoin these future claims without taking their owners' interests into account would upset Congress's careful balance and undermine the overall goals of *both* the broader discharge provisions in § 524 *and* the more specific asbestos channeling injunction provisions at § 524(g).

Against this backdrop, § 524(g)'s use of the word "may" is best understood to confer optionality on bankruptcy courts—not debtors. After all, "the use of the word 'may' is not 'necessarily conclusive of congressional intent to provide for a permissive or discretionary authority.'" *Yoo v. United States*, 43 F.4th 64, 73 (2d Cir. 2022) (quoting *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 198 (2000)); *see also Chicken Ranch Rancheria of Me-Wuk Indians v.*

27

*California*, 42 F.4th 1024, 1034 (9th Cir. 2022) (noting that "'may' is not necessarily a fully permissive term—it does not always mean one 'may' do *anything*, or that everything following the 'may' is merely by way of suggestion. Depending on the context, 'may' can be limiting, meaning '*may only*.'"). The ordinary permissive use of the word "may" in a statute "can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." *United States v. Rodgers*, 461 U.S. 677, 706 (1983).

In *Cooper*, for instance, the Court concluded that a statute's use of the word "may" meant that a party was allowed to seek contribution from another party after meeting certain conditions, but could *not* seek contribution if those conditions went unmet. *See* 543 U.S. at 166. "The natural meaning of this sentence," it reasoned, "is that contribution may only be sought subject to the specified conditions" in the provision. *Id.* Like with § 524(g), "a party must satisfy the conditions of" a statute before it can make use of the statute's benefits. *Id.* at 167.

The Supreme Court applied the same logic to a statute governing national banks, which explained actions against bank associations "may be had . . . in any State . . . court in the county . . . in which said association is located." *Citizens & S. Nat'l Bank v. Bougas*, 434 U.S. 35, 35-36 (1977) (quoting 12 U.S.C. § 94). As the Court explained, "despite the presence of what might be regarded as permissive

language, [it] is not permissive, but mandatory." *Id.* at 38 (citation omitted). A litigant "may . . . sue[ ]" a bank association in the state "where the banks are located," or she may choose not to sue. *Id.* But the statute's "may" does not license her to sue in some other state court entirely.

The same is true here. A debtor may take or leave § 524(g), but it may not pick and choose from among its benefits and requirements. The "may" language does not render § 524(g) optional in the sense that a defendant may opt in to its allowance for enjoining future asbestos liability while opting out of its strict requirements. Rather, the "may" language only limits the circumstances when a court can grant such relief. Just as the litigants in *Cooper* and *Citizens* "may" seek contribution or "may" sue a bank association after meeting certain statutory requirements, a court *may* grant an injunction channeling future asbestos claims only after a debtor meets the specified conditions in § 524(g).

Indeed, sometimes debtors consciously eschew § 524(g)'s protections, accounting for future asbestos liabilities in other ways. For example, courts have crafted pass-through plans allowing creditors to pursue insured claims in the tort system rather than recovering from a trust. *See*, *e.g.*, *In re Dana Corp.*, 2008 WL 11404248, at *4 (S.D.N.Y. Sept. 30, 2008) (affirming legality of a plan that "does not create a trust," and neither were "the Asbestos Personal Injury Claims channeled in any way"). In that case, where "[a]sbestos claimants [we]re the only

29

unsecured claims who may look to the almost $1.5 billion in insurance assets" the debtor possessed, a § 524(g) plan was unnecessary. *Id.* Instead, "the asbestos claims were reinstituted against a viable Dana." *Id.* That solution is acceptable too—the "may" in § 524(g) preserves courts' flexibility to tailor a bespoke plan to suit the debtor's unique circumstances.

It also comes as no surprise that a provision of the Bankruptcy Code would use the word "may" when providing for a supplemental authority to the Code's general discharge provisions. "It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994). Section 524(g) itself arose from a bankruptcy court's creative solution to an intractable problem. The text of § 524(g), therefore, retains a court's discretion to craft remedies tailored to the specific circumstances of the case within due process and statutory limits.[9] Congress's decision to preserve bankruptcy courts' equitable discretion does not mean parties remain free to ignore the requirements of § 524(g) and still reap its benefits.

---

[9] For example, courts have exercised discretion to allow debtors to discharge asbestos liability when § 524(g) was outright unavailable because the debtor had not yet "been named as a defendant" in an asbestos case. *See*, *e.g.*, *In re Placid Oil Co.*, 753 F.3d 151, 158 (5th Cir. 2014) (debtor unaware of any asbestos-related claims against it prior to confirmation); *In re Chateaugay Corp.*, 2009 WL 367490, at *5 (Bankr. S.D.N.Y. Jan. 14, 2009) ("[n]o asbestos claims had been brought against [the debtor]" prior to its chapter 11 cases).

### 3. Section 524(h) confirms § 524(g)'s role as the exclusive discharge provision for future asbestos claims

Section 524(h)—the companion provision to § 524(g)—confirms this reading. Section 524(h) retroactively blessed *Manville*-like asbestos bankruptcies, but *only* if those bankruptcies adhered to certain procedural safeguards like those in § 524(g). *See* 11 U.S.C. § 524(h)(1)(B) (conditions include "appoint[ing] a legal representative for the purpose of protecting the rights of persons that might subsequently assert [future] demands"). The provision thus reflected a congressional recognition that the bankruptcy law under which the *Manville* court had ruled may not have supported the court's approach. Section 524(h) addressed Congress's concern by specifically delineating a court's statutory authority to discharge future asbestos liability outside of (or before the enactment of) § 524(g).

### B. Congress Intended § 524(g) To Govern The Discharge Of Future Asbestos Claims

The legislative history surrounding the enactment of § 524(g) makes clear that Congress enacted it as the exclusive mechanism to satisfy future asbestos claims. Congress crafted § 524(g) as a "creative solution to help protect . . . future asbestos claimants." *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 359 (3d Cir. 2012) (quoting H.R. Rep. No. 103-835, at 40 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3348, in the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111, 108 Stat. 4106, 4113-17 (codified at 11 U.S.C. § 524(g)-(h))).

31

Congress intended it to enable "corporations saddled with asbestos liability to obtain the 'fresh start' promised by bankruptcy." *Id.* (citing H.R. Rep. No. 103-835, at 40).

Legislative history confirms that Congress intended to allow release of future asbestos liability only if a bankruptcy uses "trust/injunction mechanisms that meet the same kind of high standards with respect to regard for the rights of claimants, present and future, as displayed in" *Manville*. H.R. Rep. No. 103-835, at 41. The House Report emphasized that, "[i]n order for future claimants to be bound by a trust/injunction," the reorganization must include a trust that "operate[s] in a structure and manner necessary to give reasonable assurance that the trust will value, and be able to pay, similar present and future claims in substantially the same manner." *Id.* Bankruptcies that do not satisfy these "high standards" do not suffice to bind future claimants.

The legislative history of § 524(g) also confirms that Congress sought specifically to compensate for due process concerns resulting from the discharge of future claims arising from prepetition exposures. The House Report noted the "long latency period" for asbestos-related injuries, explaining that the "central" concern for these debtors was "how to deal with future claimants—those who were not yet before the court, *because their disease had not yet manifested itself.*" *Id.* at 40 (emphasis added).

Section 524(g) therefore arose from Congress's concern "that full consideration be accorded to the interests of future claimants, who, by definition, do not have their own voice." *Id.* By way of a solution, Congress crafted "a mechanism to address equitably the debtor's liability to all creditors, including mass tort claims—both those whose injuries are manifest and those who, although already exposed, will not manifest any injury until sometime in the future." 140 Cong. Rec. S4523 (daily ed. Apr. 20, 1994) (statement of Sen. Heflin).

### C. Congress Intended § 524(g) To Advance Important Policy Objectives In Protecting Future Claimants

Chapter 11 of the Bankruptcy Code advances complementary purposes. First, the Code "aims, in the main, to secure equal distribution among creditors." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006). Second, chapter 11 "embodies the general Code policy of maximizing the value of the bankruptcy estate." *Toibb v. Radloff*, 501 U.S. 157, 163-64 (1991). Revlon's end run around § 524(g) vitiates both.

As courts have long recognized, these two fundamental bankruptcy principles break down in the asbestos context. "[A] reorganization plan that failed to account for future asbestos liabilities would be of limited utility to the debtor, and likewise, a reorganization plan that did not address future claimants would fail to provide adequately for all parties with an interest in the debtor's assets." *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 366 (3d Cir. 2022).

33

Section 524(g) charts a path for debtors facing overwhelming future asbestos liabilities to address them in a manner consistent with these twin goals. For equitable distribution among creditors, § 524(g) serves an essential purpose—it applies only where pursuing remedies "outside the procedures prescribed by [the] plan is likely to threaten the plan's purpose to deal equitably with claims and future demands." 11 U.S.C. § 524(g)(2)(B)(ii)(III). By requiring the appointment of a future claims representative and insisting on supermajority support of current creditors for the Plan, § 524(g) ensures that the plan treats future claimants fairly with respect to their co-creditors. *Id.* § 524(g)(2)(B)(i)(III)(bb), (g)(4)(B)(i).

Compliance with § 524(g) and the *Manville* structure also "ensure[s] that health claims can be asserted only against the Trust." *Kane*, 843 F.2d at 640; *see also Truck Ins. Exch.*, 602 U.S. at 274. Consistent with that goal, the Manville trusts "were created . . . for the purpose of maximizing assets and paying claimants." *In re Johns-Manville Corp.*, 2019 WL 5965205, at *1 (S.D.N.Y. Nov. 13, 2019). Section 524(g) serves both goals.

According to the Bankruptcy Court, the prescribed steps were unnecessary. But Revlon's Plan did not treat future and current claimants equitably. It did not maximize the value of the assets available to the *whole* group of creditors, which includes future claimants. As to future claimants, the Plan served the exclusive

34

interests of Revlon. This Court should not reward that maneuver and open the door to future companies wishing to sidestep the requirements of § 524(g).

Nor can Revlon defend the Bankruptcy Court's opinion by leaning on the support of those talc asbestos claimants who did go along with the Plan. The interests of *present* asbestos claimants under the *Revlon* plan diverged from those of future asbestos claimants. Present claimants were paid. Future claimants were not.

### D.     The Bankruptcy Court Misinterpreted § 524(g)

Applying those legal principles to this case's facts compels reversal. In enforcing the injunction against Claimants, the Bankruptcy Court concluded that the ordinary discharge provisions of the Bankruptcy Code were sufficient to bind them. Bankruptcy Decision at 8-9 (JA___-__). Its explanations failed entirely to reckon with the specifics of § 524(g); instead, it relied on the Code's generic provisions. Revlon's purported compliance with those provisions does not suffice to enjoin Claimants.

### 1.     The word "may" empowers courts, not debtors

The Bankruptcy Court's holding depends on the mistaken notion that the word "may" renders § 524(g) optional for debtors wishing to discharge known future asbestos liability. The Bankruptcy Court held that "nothing in the statute's text terms the provision the exclusive or mandatory way debtors must treat claims

that stem from asbestos exposure." Bankruptcy Decision at 11 (JA___). That point aims at a straw man. No one argues that § 524(g) marks the "exclusive or mandatory way debtors must treat claims" of this kind *outside* a chapter 11 bankruptcy reorganization. Debtors are free to completely retain their future asbestos liabilities after a bankruptcy. Section 524(g)'s use of the word "may" reinforces bankruptcy courts' discretion in their gatekeeping role. It does not cede that discretion to the debtor—after all, the general discharge provisions in the Bankruptcy Code cannot be used "to achieve a result not contemplated by the more specific provisions of § 524(g)." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 237 & n.50 (3d Cir. 2004).[10]

The Bankruptcy Court made much of § 524(g)'s reference "to itself as available 'to *supplement* the injunctive effect of a discharge under this section."

---

[10] In *In re Energy Future Holdings Corp.*, 949 F.3d 806, 811 (3d Cir. 2020), the Third Circuit similarly explained that discharges without § 524(g) are permissible only if "the claimants receive an opportunity to reinstate their claims after the debtor's reorganization that comports with due process." It is far from clear, however, that the remedy of allowing a creditor to file a late proof of claim under Bankruptcy Rule 3003(c)(3) could adequately provide for future claimants where the trust established for paying asbestos claims is of only limited duration and is not funded adequately for paying such future claims. The court further labeled the case a "cautionary tale for debtors attempting to circumvent § 524(g)." *Id.* at 825. Notably, *Energy Future Holdings* did not reach the issue of whether a § 524(g) trust is required to enjoin future asbestos claimants because it determined that it was statutorily barred from granting such relief. *Id.* at 821 ("We are therefore barred by § 363(m) from reaching Appellants' argument that they were entitled to pre-confirmation process.").

Bankruptcy Decision at 11 (JA___) (quoting 11 U.S.C. § 524(g)(1)(A)) (emphasis added). It therefore concluded that the "additional relief that Section 524(g) authorizes" does not "disturb[] or eliminat[e]" what § 524(a) provides. But this "supplement" language cuts against Revlon. If the general discharge provisions work as Revlon says, § 524(g) is no "supplement" at all—it is a nullity. For § 524(g) to "supplement" the injunction available in general to debtors through § 524(a), it must provide something more than § 524(a) already provides. That "something more" is the channeling injunction for known future asbestos claims. The "supplement" language in § 524(g) must have some effect, rather than be pure superfluity—and for that to be true, § 524(a)'s general discharge provisions must not supply the future discharge of known asbestos claims encompassed within § 524(g)'s exclusive remit.

In holding otherwise on this point, the Bankruptcy Court discussed injunctions that run in favor of third parties, deciding that "one main purpose of [§] 524(g) is to extend the protection of a plan injunction to non-debtors in the narrow context of asbestos-related cases." Bankruptcy Decision at 11-12 (JA___-___). But the third-party release is not the "supplement" that § 524(g) provides; it represents only an optional component to § 524(g)'s two-pronged trust and channeling injunction structure covering derivative liability for third parties making adequate contributions to the § 524(g) trust. 11 U.S.C. § 524(g)(4)(B)(ii)

37

(noting injunctions may be granted "in light of the benefits provided . . . to such trust on behalf of . . . such third party").  The Bankruptcy Court's centering of the third-party release misses the point; the injunction channeling future asbestos claims to a trust, not the third-party release, is what "supplement[s]" the Code's ordinary discharge provisions.

### 2. Section 524(a) confers additional discharge authority not present in the general discharge provisions

The Bankruptcy Court further erred by observing that "no part of Section 1141(d) carves out any exception to discharge for asbestos claims," and from there concluding the general provisions suffice for such a discharge.  Bankruptcy Decision at 11 (JA___).  This conclusion ignores the general/specific canon.  According to the Bankruptcy Court, a statute must include explicit language saying that a specific section of a statute controls to address the specific problem contemplated by that section.  But the general/specific canon "applies wherever an act contains general provisions and also special ones upon a subject, which, standing alone, the *general provisions would include*."  *United States v. Chase*, 135 U.S. 255, 260 (1890) (emphasis added).  The Bankruptcy Court turns that law on its head by opining that the general provisions must *exclude* the specific situation for the canon to function.

The Bankruptcy Court also misinterpreted the Supreme Court's explanation that it did not read "§ 524(g) to 'impair' or 'modify' authority previously available

38

to courts in bankruptcy." Bankruptcy Decision at 13 (JA___) (quoting *Harrington*, 603 U.S. at 222 n.5). But to say that Claimants' reading of § 524(g) would "impair" previously available authority begs the question and assumes that courts possessed this authority before § 524(g)'s enactment. They did not. And in context, *Harrington* bolsters that conclusion—the Supreme Court read § 524(g) to "confer upon bankruptcy courts a novel and extraordinary power." 603 U.S. at 222 n.5. But that "novel and extraordinary" tool that bankruptcy courts previously lacked would serve no purpose if a debtor could simply avoid using it and still obtain its benefits.

## II. Due Process Requires A Mechanism To Protect Future Claimants' Rights Beyond The General Discharge Provisions

Revlon's plan to circumvent § 524(g) violates the due process rights of future claimants. Revlon's reorganization would dispose of Claimant's property interests in their claims—eliminating their choses in action—without an opportunity to be heard. The Due Process Clause therefore separately bars the injunction's effect against Claimants.

### A. Future Claimants Have A Due Process Right To Vindicate Their Claims

Under the Fifth Amendment, the government cannot deprive a person of property without due process of law. U.S. Const. amend. V. That protection extends to choses in action, which the Supreme Court has recognized as a form of

property. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429 (1982) ("The Court traditionally has held that the Due Process Clauses protect civil litigants who seek recourse in the courts[.]"); *see also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) (identifying causes of action as protected property interests).

Latent tort claims arising from prepetition exposure—such as those in asbestos cases—present no exception. While these claims may not have fully liquidated or manifested at the time of bankruptcy, they nonetheless represent interests rooted in pre-bankruptcy conduct. *See In re Chateaugay Corp.*, 944 F.2d 997, 1003-05 (2d Cir. 1991). For unknown future claimants, due process requires more than the mechanical application of statutory discharge. Because these individuals cannot assert or defend their rights at the time of the bankruptcy, Congress crafted specialized safeguards in Section 524(g): among others, the future claims representative, the supermajority voting requirement, and the requirement that the injunction's operation be "fair and equitable with respect to the persons that might subsequently assert" claims. § 524(g)(4)(B)(ii).

Because latent asbestos claims qualify as constitutionally protected property, a bankruptcy court may channel or discharge them only through procedures (like those in § 524(g)) that afford a meaningful substitute for notice to future claimants

and an opportunity for them to be heard.  Anything less produces an unconstitutional deprivation without due process.

### B.  General Discharge Provisions Do Not Satisfy Due Process For Future Claimants

Future creditors like Claimants pose a serious challenge for due process in bankruptcy.  Even outside of § 524(g), courts have raised the alarm about the significant problem of binding future claimants unaware of their diseases—and that challenge "arise[s] starkly in the situation presented by persons with asbestos injuries that are not manifested until years or even decades after exposure."  *In re Grossman's, Inc.*, 607 F.3d 114, 126 (3d Cir. 2010) (en banc).  But notice to future asbestos claimants whose disease has not manifested is impossible.  That remains true whether or not the claimants are "unknown."  Even if it were otherwise, any notice program would need to make extraordinary efforts to apprise such claimants that, if they ever do get sick, they might have a claim based on exposure to the relevant asbestos-containing products.  (For much the same reason, in fact, the discharge Revlon envisions would also cut off the jury trial right of personal injury claimants.  The law forbids that outcome.[11])

---

[11] *See* 28 U.S.C. § 1411(a) ("Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.").

Though courts have not squarely addressed notice to latent asbestos claimants in the bankruptcy context, the Supreme Court has confronted this issue in class-action settlements. In *Amchem Products, Inc. v. Windsor*, the Supreme Court considered the certification of a class action that included individuals who—like Claimants, as of the Bar Date—had suffered exposure to asbestos without having yet manifested symptoms. 521 U.S. 591, 597, 602-03 (1997). The Supreme Court recognized severe "[i]mpediments to the provision of adequate notice" for those claimants who have "no perceptible asbestos-related disease." *Id.* at 628 (citing *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996) ("Problems in adequately notifying and informing exposure-only [claimants] of what is at stake . . . may be insurmountable.")).

*Amchem*'s issue, arising out of Federal Rule of Civil Procedure 23, centered on opt-out notice for a putative class of asbestos victims. As for those notices, the Supreme Court underscored that—even if an unmanifested asbestos claimant were to read and "fully appreciate the significance" of the notice—a claimant not yet diagnosed with an asbestos-related illness would lack "information or foresight" necessary to make an intelligent decision about her claim. "Many persons in the exposure-only category," the Court reasoned, "may not even know of their exposure, or realize the extent of the harm they may incur." *Id.* Picking up on the *Amchem* thread, the Second Circuit has similarly acknowledged that effective

42

notice is likely an impossibility for unmanifested future claimants. *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 261 n.8 (2d Cir. 2001) ("*Amchem* indicates that effective notice could likely not ever be given to exposure-only class members."), *aff'd in relevant part, rev'd in part*, 539 U.S. 111 (2003).

Section 524(g) solves that problem by incorporating safeguards to protect the interests of future claimants. The court must appoint a legal representative for future claimants, § 524(g)(4)(B)(i); must ensure that the plan is approved by a 75 percent supermajority vote of current claimants, § 524(g)(2)(B)(ii)(IV)(bb); and must verify that the plan includes mechanisms to ensure that similar future claims will obtain substantially similar recoveries to current claims, § 524(g)(2)(B)(ii)(V). Each of these provisions—and especially the combined apparatus—is "specifically tailored to protect the due process rights of future claimants." *Combustion Eng'g*, 391 F.3d at 234 n.45. "Without the appointment of . . . [a future claims representative] to provide adequate representation to the absent future claim holders, it is doubtful that the injunction provisions binding them would be found to comply with the due process clause." *In re Johns-Manville Corp.*, 551 B.R. 104, 114 (S.D.N.Y. 2016) (quoting 4 *Collier on Bankruptcy* ¶ 524.07 (16th ed. 2025)). This case confirms the correctness of that concern.

Finally, while the Bankruptcy Court contends that "the Second Circuit has rejected the argument that the lack of a future claims representative . . . amount[s]

to a denial of due process," Bankruptcy Decision at 13 (JA___), the case law does not bear that out.  The Bankruptcy Court's sole authority on this point is *In re Johns-Manville Corp.*, 2022 WL 4487889 (2d Cir. Sept. 28, 2022) (summary order).  But that case's holding rested on different grounds.  There, the claimant advanced asbestos claims against Johns-Manville many years after its bankruptcy inspired § 524(g).  He argued in part that the timing of the *Manville* bankruptcy had meant the claim had not benefited from a future claims representative's input.  But that court reasoned that the claimant "was indeed represented by a [future claims representative] in the Manville bankruptcy proceedings," which supplied the backdrop for that case.  *Id.* at *3.  That *Manville* bankruptcy, after all, was the model Revlon failed to follow.  Just the opposite occurred here, where no future claims representative existed.

## III.  Even If Revlon Could Discharge Future Asbestos Liability Without § 524(g), Revlon's Notice Program Did Not Satisfy Due Process

Even if Revlon could somehow discharge its known future asbestos liability through the Code's general discharge provisions, it did not satisfy the fundamental requirements for such a discharge.  Due process requires debtors to provide adequate notice of a bankruptcy to both known and unknown creditors.  *See Mullane*, 339 U.S. at 315.  Revlon's notice program did not satisfy due process requirements as to future asbestos claimants.

### A. Due Process Requires Adequate Notice To All Creditors

To bind a party before the deprivation of their rights requires adequate notice. *Mullane*, 339 U.S. at 314. That means "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* On the flip side, "process which is a mere gesture is not due process." *Id.* at 315. Instead, the notice must be "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* When a debtor fails to provide adequate notice, the penalty is that it receives no discharge as to such claimants. *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d Cir. 2014) ("[A] claim cannot be discharged if the claimant is denied due process because of lack of adequate notice."); *Jones v. Chemetron Corp.*, 212 F.3d 199, 209 (3d Cir. 2000) ("[I]f a potential claimant lacks sufficient notice of a bankruptcy proceeding, due process considerations dictate that his or her claim cannot be discharged by a confirmation order.").

This analysis boils down to a dichotomy: the analysis differs depending on the creditor's status as "known" (that is, their identity is known or reasonably ascertainable to the debtor) or "unknown." *In re J.A. Jones, Inc.*, 492 F.3d 242, 249 (4th Cir. 2007). For unknown creditors, publication notice may sometimes suffice. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346, 349 (3d Cir. 1995)

("[f]or unknown claimants, notification by publication will *generally* suffice," but the court must still ensure that the "publication notice [is] reasonably designed to reach all interested parties") (emphasis added). This Court, for example, considers notice protocols a "mere gesture" and inadequate when a party publishes just one notice in one newspaper for one day. *Hecht v. United Collection Bur., Inc.*, 691 F.3d 218, 224 (2d Cir. 2012). At bottom, the content of the notice must suffice to put the claimant on actual notice. *Mullane*, 339 U.S. 314 ("The notice must be of such nature as reasonably to *convey the required information*[.]") (emphasis added).

In line with that rule, a vague notice that does not describe the nature of claims set for discharge fails due process standards. *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010) (per curiam) (holding that a claimant-insurer could not be bound by bankruptcy court's orders where, "even if [the insurer] received the Notice document, it could not have anticipated . . . that its . . . claims . . . would be enjoined"). Similarly, "notice" to a party unaware of any claim against the debtor is constitutionally suspect. Courts remain rightly suspect that an individual "could be deemed to have relinquished substantive rights when, even if that individual had read the 'notice,' those individuals would have remained completely unaware that their substantive rights were affected." *In re Waterman*

46

*S.S. Corp.*, 141 B.R. 552, 559 (Bankr. S.D.N.Y. 1992), *vacated and remanded on other grounds, aff'd in relevant part*, 157 B.R. 220 (S.D.N.Y. 1993).

**B.      Revlon's Notice To Future Asbestos Claimants Was Insufficient**

Revlon's notice to future asbestos claimants falls short of these standards. To begin with, the Notice ***does not mention talc products at all***. It does not mention asbestos. It does not mention the brands Revlon knew were associated with those asbestos-contaminated talc claims, such as Jean Nate.[12] The generic Notice provided only in general terms that "ANY PERSON OR ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM IN THESE CHAPTER 11 CASES" faced the bar order. *Revlon* ECF No. 758 (JA___). The Notice therefore provided no notice for a user of a Revlon talc product—particularly one with no diagnosed disease—to have any idea the bankruptcy threatened any rights they might hold.

Due process calls for an analysis of the notice program "under all the circumstances" of the case. *Mullane*, 339 U.S. at 314. Future asbestos creditors like Claimants received only token notice in the form of a barebones, nondescript general bankruptcy notice without mentioning talc nor the products containing it.

---

[12] The lack of brand names presented additional problems because many future talc claimants would not associate the brands with Revlon. Jean Nate, for example, a line of fragranced body powder, often did not contain any reference to Revlon, because, up until 1987, other firms owned the brand. Denise Gellene, *Revlon Buys Several Fragrance Brands*, L.A. Times (June 17, 1987).

The Bankruptcy Court deemed that as sufficient warning that (1) Revlon's products may have given talc claimants mesothelioma or other latent asbestos-related injuries and (2) their right to seek redress was to be barred. These notices, far from prominently displayed, appeared for one day in each newspaper in obscure locations: at the very back of either the business section or the news section.[13]

Yet Revlon knew how to give proper notice in other circumstances. It did so for the hair relaxer claimants, for whom news of the bankruptcy arrived through a notice program translated into several languages, with easy-to-read graphics, a list of relevant products, and social media dissemination. This notice ultimately managed to reach at least 17,000 targeted people in territories like Puerto Rico alone—to say nothing of the notice program's mainland reach. *In re RML, LLC*, 657 B.R. 709, 722 (Bankr. S.D.N.Y. 2023).

By comparison, Revlon's notice program for their talc and asbestos claimants represents precisely the sort of "mere gesture" that the Supreme Court cautioned against in *Mullane*. 339 U.S. at 315. This Court should not condone Revlon's inadequate notice program for future asbestos victims.

---

[13] *See* Ex. B to Cls.' Opp., Bankr. ECF No. 1051 at 7, 9 & 13.

## **CONCLUSION**

Accordingly, this Court should reverse the Bankruptcy Court's Enforcement

Order.

Dated: May 20, 2025

Respectfully submitted,

/s/ *David C. Frederick*

| | |
|---|---|
| Kevin C. Maclay | David C. Frederick |
| James P. Wehner | Kathleen W. Hickey |
| Todd E. Phillips | Jared M. Stehle |
| Lucas H. Self | KELLOGG, HANSEN, TODD, FIGEL |
| Ariel K. Hayes | & FREDERICK, P.L.L.C. |
| CAPLIN & DRYSDALE, CHARTERED | 1615 M Street, N.W., Suite 400 |
| 1200 New Hampshire Ave., N.W. | Washington, D.C. 20036 |
| 8th Floor | (202) 326-7900 |
| Washington, D.C. 20036 | dfrederick@kellogghansen.com |
| (202) 862-5000 | khickey@kellogghansen.com |
| kmaclay@capdale.com | jstehle@kellogghansen.com |
| jwehner@capdale.com | |
| tphillips@capdale.com | |
| lself@capdale.com | |
| ahayes@capdale.com | |

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32 and Local Rule 32.1 because it contains 11,227 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5), (6) because it has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

<u>/s/ *David C. Frederick*</u>

May 20, 2025

# STATUTORY ADDENDUM

**11 U.S.C. § 524 (excerpt)**

## 11 U.S.C § 524

**11 U.S.C. § 524 – Effect of discharge**

**(a)** A  discharge in a case under this title—

   **(1)** voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1192, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

   **(2)** operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

   **(3)** operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1192, 1228(a)(1), or 1328(a)(1), or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

                              * * * * *

**(g)**

   **(1)**

      **(A)** After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.

      **(B)** An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting,

recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i), except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization.

**(2)**

**(A)** Subject to subsection (h), if the requirements of subparagraph (B) are met at the time an injunction described in paragraph (1) is entered, then after entry of such injunction, any proceeding that involves the validity, application, construction, or modification of such injunction, or of this subsection with respect to such injunction, may be commenced only in the district court in which such injunction was entered, and such court shall have exclusive jurisdiction over any such proceeding without regard to the amount in controversy.

**(B)** The requirements of this subparagraph are that—

**(i)** the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization—

**(I)** is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

**(II)** is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;

**(III)** is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of—

**(aa)** each such debtor;

**(bb)** the parent corporation of each such debtor; or

**(cc)** a subsidiary of each such debtor that is also a debtor; and

**(IV)** is to use its assets or income to pay claims and demands; and

**(ii)** subject to subsection (h), the court determines that—

**(I)** the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

**(II)** the actual amounts, numbers, and timing of such future demands cannot be determined;

**(III)** pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands;

**(IV)** as part of the process of seeking confirmation of such plan—

**(aa)** the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties pursuant to paragraph (4)(A), are set out in such plan and in any disclosure statement supporting the plan; and

**(bb)** a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

**(V)** subject to subsection (h), pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

**(3)**

    **(A)** If the requirements of paragraph (2)(B) are met and the order confirming the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the order that issues or affirms the plan—

        **(i)** the injunction shall be valid and enforceable and may not be revoked or modified by any court except through appeal in accordance with paragraph (6);

        **(ii)** no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

        **(iii)** no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason;

    **(B)** Subparagraph (A) shall not be construed to—

        **(i)** imply that an entity described in subparagraph (A)(ii) or (iii) would, if this paragraph were not applicable, necessarily be liable to any entity by reason of any of the acts described in subparagraph (A);

        **(ii)** relieve any such entity of the duty to comply with, or of liability under, any Federal or State law regarding the making of a fraudulent conveyance in a transaction described in subparagraph (A)(ii) or (iii); or

        **(iii)** relieve a debtor of the debtor's obligation to comply with the terms of the plan of reorganization, or affect the power of the court to exercise its authority under sections 1141 and 1142 to compel the debtor to do so.

**(4)**

    **(A)**

        **(i)** Subject to subparagraph (B), an injunction described in paragraph (1) shall be valid and enforceable against all entities that it addresses.

        **(ii)** Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

            **(I)** the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

            **(II)** the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

            **(III)** the third party's provision of insurance to the debtor or a related party; or

            **(IV)** the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—

                **(aa)** involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

                **(bb)** acquiring or selling a financial interest in an entity as part of such a transaction.

        **(iii)** As used in this subparagraph, the term "related party" means—

            **(I)** a past or present affiliate of the debtor;

    **(II)** a predecessor in interest of the debtor; or

    **(III)** any entity that owned a financial interest in—

        **(aa)** the debtor;

        **(bb)** a past or present affiliate of the debtor; or

        **(cc)** a predecessor in interest of the debtor.

**(B)** Subject to subsection (h), if, under a plan of reorganization, a kind of demand described in such plan is to be paid in whole or in part by a trust described in paragraph (2)(B)(i) in connection with which an injunction described in paragraph (1) is to be implemented, then such injunction shall be valid and enforceable with respect to a demand of such kind made, after such plan is confirmed, against the debtor or debtors involved, or against a third party described in subparagraph (A)(ii), if—

    **(i)** as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind, and

    **(ii)** the court determines, before entering the order confirming such plan, that identifying such debtor or debtors, or such third party (by name or as part of an identifiable group), in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party.

\* \* \* \* \*